Filed 2/26/26  P. v. Fonseca CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JACOB RAYMOND FONSECA,<br><br>    Defendant and Appellant. | F088871<br><br>(Super. Ct. No. MCR067403A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Galen N. Farris and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On August 15, 2020, defendant Jacob Raymond Fonseca shot and killed Morgan Reid. On September 3, 2024, he was convicted of first degree murder. On appeal, he argues: (1) the trial court's failure to give the heat of passion voluntary manslaughter instruction violated his right to due process; (2) defense counsel provided ineffective assistance because they failed to ensure that the jury was instructed regarding the effect of provocation on the degree of murder; (3) the prosecution committed misconduct by misstating the unanimity requirement for a finding of first degree murder; and (4) the court erred by excluding as irrelevant Serena's testimony that she was surprised by the shooting. The People disagree. We affirm.

## PROCEDURAL HISTORY

On July 31, 2023, the District Attorney of Madera County filed a first amended information charging defendant with murder (Pen. Code, § 187, subd. (a); count 1).[1] The information also alleged, inter alia, that defendant personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)).

On September 3, 2024, the jury found defendant guilty of first degree murder and found the section 12022.53, subdivision (d) firearm allegation true. On October 28, 2024, defendant was sentenced to an aggregate term of 75 years to life.

On October 29, 2024, defendant timely filed a notice of appeal.

## FACTUAL SUMMARY[2]

**The Prosecution's Case**

On or about July 22, 2020, Morgan, Nate, and Juan were in a truck driving to the office of the landscaping company where they worked. Their boss was also in the truck. While they were driving, they saw defendant walking on the roadway.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Multiple percipient witnesses testified regarding what occurred, and there are variations in the testimony regarding how the events unfolded. We summarize the facts as relevant to this appeal and do not include a summary of all variations.

Defendant approached the truck, and Morgan and Juan got out. Juan thought defendant was going to fight Morgan, but defendant rushed Juan and swung at him. Juan dodged the swing and hit defendant, knocking him out.

Juan immediately got back into the truck. Morgan and Nate each kicked defendant at least once while he was on the ground, then they got back into the truck.

Serena, defendant's girlfriend, arrived. She moved defendant, who was dazed, into her car. She called emergency medical services and defendant received treatment.

On August 15, 2020, in the afternoon, defendant and Serena approached Manuel (Serena's brother and Morgan's cousin) at a convenience store. Manuel was close with Morgan. Defendant told Manuel to tell Morgan that defendant wanted to fight Morgan one-on-one.

Manuel then went to Morgan's residence. Morgan, his fiancée Taylor, and their son were at home. Nate and Juan were staying with them at the time.

Manuel asked where Morgan was, and he said that defendant was there and wanted Morgan to come outside so defendant could "smoke Morgan."[3] Shortly afterwards, Serena knocked on the door and Taylor opened it. Serena told her, "'[t]he problem is not with you or your son; it is with Morgan. We just want to fight one on one. No cops.'"

Morgan heard that defendant wanted to fight him. The fight was supposed to occur without weapons. Morgan put on his shoes, took off his shirt, and went outside. Taylor followed him outside and stood next to Serena. Nate and Juan also went outside. Juan had recently been shot and, as a result, he was wearing a neck brace and his mouth was wired shut.

---

[3]    Taylor testified that she thought Manuel was telling her defendant wanted to shoot Morgan. Manuel testified that he only spoke to Morgan and he told Morgan defendant wanted to fight.

3.

Defendant and Morgan both got into a fighting stance. As they were about to fight, defendant saw Juan. After defendant saw Juan, he ran to his car, which was approximately three or four steps away. Juan ran. Defendant picked up a gun that was in the car, went to about where he was previously standing, and shot Morgan three times. They were approximately eight feet apart when defendant shot Morgan. Morgan put his hands up, stumbled, and fell.

There was a pause between the first shot and the second two. Additionally, two live rounds were found on the ground. According to Robert Blehm, a lieutenant with the Madera County Sheriff's Office, a reasonable explanation for this evidence is that defendant's gun malfunctioned after the first shot and he had to clear the malfunction before firing the second two shots.

After defendant shot Morgan, defendant and Serena ran to their car and drove away.

Later that day, defendant surrendered himself to law enforcement officers. While interacting with law enforcement officers, defendant spontaneously stated, "'I had to do it. I couldn't let him disrespect me that way.'"

Morgan died from the gunshot wounds.

Based on GPS data, defendant was near Morgan's residence once on August 5, 2020, and three times on August 6, 2020. He was also near Morgan's residence multiple times on the day of the shooting. Additionally, on August 8, 2020, defendant texted Serena, "'I'll go kill Morgan and them today, and you will have [our daughter.]'"

**Defendant's Case**

### Testimony of Serena

Defendant called Serena as a witness. According to Serena, on July 22, 2020, defendant was walking along a road. Serena drove towards him and told him to get in her car. Their daughter was in the vehicle.

A truck pulled up next to defendant, and Morgan and Juan exited. Juan hit defendant in the head with an object, and defendant lost consciousness. Juan hit defendant approximately two times after he fell, then Juan ran back to the truck. Morgan and Nate kicked defendant "all over" while he was on the ground. Morgan also hit defendant in the head with his fist. Morgan and Nate did not stop until Serena jumped on defendant. After yelling at Serena to move her car, Morgan got in her car and tried to move it.

With the help of bystanders, Serena got defendant in her car. Defendant was ultimately taken to the hospital.

On August 15, 2020, Serena and defendant ran into Manuel at a convenience store. They asked Manuel to ask Morgan if Morgan wanted to fight defendant. The fight was a way to resolve what occurred on July 22, 2020, without involving law enforcement. It was supposed to be one-on-one with no weapons.

Manuel eventually told them that they could go to Morgan's house. When Serena and defendant arrived at Morgan's house, they got out of the car. Taylor had told them they had to empty their pockets, and Serena went to tell Taylor that she did not have any weapons and that she did not have a problem with Taylor.

While Serena was speaking with Taylor, other people were outside as well, including Juan, Nate, and Morgan. Morgan and defendant were getting ready to fight, and they both got into a fighting stance. She was still talking with Taylor when she heard yelling. She turned around and yelled at defendant because he had shot Morgan. Subsequently, she and defendant left in her car.

On cross-examination, Serena admitted she told law enforcement that prior to going to Morgan's house, Serena and defendant were in the area, and they saw people around Morgan's house. She also admitted she told law enforcement that this made defendant angry. Finally, she admitted she told law enforcement that defendant told her

5.

he shot Morgan because "'[h]e hated them. He hated them. He hated them, and … he would kill them all if he could[.]'"

### *Testimony of Defendant*

Defendant testified on his own behalf. On July 22, 2020, defendant was walking on the side of a road when he saw a truck. The truck stopped in the middle of the road, and Morgan, Nate, and Juan got out. Defendant thought that they wanted to hurt or kill him because approximately 10 minutes earlier, Greg (Serena's brother) had told him that "[Juan] [had] a bullet with [defendant's] name on it." So, defendant ran toward one of them and started swinging.

He then heard Serena telling him to get up. It felt like he was waking up, and he did not know what had happened.

Eventually, defendant was taken to the hospital. He "discharged [him]self," but he was taken back the next day. He was suffering from a brain aneurysm, and he was told that it could have been fatal. He was also told that if he suffered another severe head injury, he could die.

Although defendant did not remember what happened, Serena later told him. He got pistol-whipped with an assault rifle. After he lost consciousness, Morgan got on top of him and hit him repeatedly. Morgan also got in their car and tried to move it, with their daughter still inside.

After this incident, defendant lived in constant fear for his life and the lives of his family members. He also felt angry and helpless. Approximately a week later, he acquired a gun so he could protect his family.

On August 15, 2020, Serena picked up defendant and their daughter after she got off work, because defendant's car had overheated. Eventually, they went to a convenience store, where defendant and Serena saw Manuel. Serena wanted defendant to resolve his issue with Morgan by fighting one-on-one, and defendant agreed. So, Serena

6.

asked Manuel if he would be willing to go to Morgan's house and ask Morgan if he would be willing to fight defendant one-on-one.

Manuel then went to Morgan's house and came back. He informed defendant and Serena that Morgan agreed to fight, so defendant and Serena went to Morgan's house.

Morgan came outside. Others were outside as well, including Juan and Nate. Taylor told defendant to empty his pockets, and he showed her his pockets. Then he and Morgan both got into a fighting stance.

After being told to empty his pockets and seeing Juan and Nate, defendant thought the fight was a set-up. Because of what happened on July 22, 2020, he feared for his life and the lives of his family members. He thought that if he beat Morgan, Juan and Nate would hurt him and his family.

So, after approximately 20 seconds of being in a fighting stance, instead of fighting Morgan, defendant ran to the car and retrieved his gun. He felt like a child again, abused and defenseless. He walked back toward Morgan and fired a warning shot without aiming. Morgan walked toward him. Defendant thought that Morgan could have been armed. Defendant paused for about 20 seconds to see if Morgan was going to lay down or run, but Morgan kept walking, so he fired a second time. Morgan looked at where he got shot and kept walking toward him. So, after pausing for about 10 seconds, defendant fired a third time.

Defendant then pointed the gun at Juan, but Serena got in front of him and told him to stop. Defendant and Serena then got in the car and left.

Defendant admitted he told law enforcement, "'I had to do it. I couldn't let him disrespect me that way.'" The disrespect he was referring to was Morgan getting into his car with his child. And he had to shoot Morgan because he was afraid for his family.

7.

***Testimony of Dr. Avak Howsepian***

Defendant called Avak Howsepian, a psychiatrist, as a witness. Dr. Howsepian reviewed relevant police reports, transcripts, medical records, video footage, and audio footage. He also interviewed defendant.

Dr. Howsepian concluded as follows:

> "[Defendant's] three major diagnoses were post-traumatic stress disorder [(PTSD)], and unspecified neurocognitive disorder, that was secondary to a traumatic brain injury suffered [as a result of the July 22, 2020 incident], and social anxiety disorder. The fact that he suffered from PTSD from a young age, made … him more vulnerable to a greater worsening of his PTSD symptoms as a result of the [July 22, 2020] assault and that made him … view his circumstances as more dangerous, more unpredictable, greater sense of threat in context in which others might not have a sense of threat at all. That was amplified by his social anxiety, vulnerabilities, sensitivities, and that was, then, augmented by this brain damage that resulted in his having an impairment and how he modulates his behavior, how he emotionally manages his stressful situations, how he organizes plans, and how he is able to focus or unfocused [*sic*] on certain things to which he is attending, all of which contributed to his acting in the way that he did at the time [of the shooting]. You know, in conjunction with those dissociative symptoms of derealization, depersonalization, flashbacks, and time distortion that caused him to very much act under the kind of pressures of those emotional aspects of his experience."

## **DISCUSSION**

I.   **Even if the Trial Court's Failure to Give the Heat of Passion Voluntary Manslaughter Instruction Was Error, That Error Was Harmless**

Defendant argues that the trial court erred by failing to give the heat of passion voluntary manslaughter instruction. According to defendant, there was substantial evidence to support the instruction based on provocation that arose over time and provocation that arose suddenly.

A.   *Applicable Law*

"The [trial] court must instruct on any lesser included offense for which there is substantial evidence to support a conviction [citation], but not if the pertinent evidence is

'minimal and insubstantial' [citation]. '"In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight."'" (*People v. Hicks* (2017) 17 Cal.App.5th 496, 507; see *People v. Najera* (2008) 43 Cal.4th 1132, 1136 ["'in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence'"].)

"Murder is the unlawful killing of a human being, …, with malice aforethought." (§ 187, subd. (a).) Malice can be express or implied. Malice is express when the defendant intends to kill the victim. (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114–1115.) Implied malice has "'"both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.'"'" (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

"Voluntary '[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice.… Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense.'" (*People v. Soto, supra*, 4 Cal.5th at p. 974.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) The provocation must, from an objective standpoint, be such as would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 950, 957 (*Beltran*).) In other words, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

As to the subjective component, the defendant must have actually acted in the heat of passion.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  "'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]'  [Citations.]  Thus, it is insufficient that one is provoked and later kills.  If sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored, [the provocation] provides no mitigation for a subsequent killing."  (*Beltran, supra*, 56 Cal.4th at p. 951.)

Additionally, "the victim must taunt the defendant or otherwise initiate the provocation."  (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

### B.	Standard of Review

"We review the trial court's failure to instruct on a lesser included offense de novo [citations,] considering the evidence in the light most favorable to the defendant [citations]."  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)  When substantial evidence supports an instruction on a heat of passion theory of manslaughter but the trial court fails to give the instruction, that failure is assessed for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (*People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)  Under this standard and in the context of instructional errors that ""misdescri[be] … the elements"' of the charged offense," reversal is required "unless the reviewing court is persuaded that ""[n]o reasonable jury"' would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' [citation]."  (*Id.* at p. 261.)

### C.	Analysis

Defendant argues there was substantial evidence that defendant killed Morgan "under the influence of fear or anger or both on August 15, 2020."  Defendant further argues that the error was prejudicial because "evidence that [Morgan's] death was a

10.

heat-of-passion voluntary manslaughter is stronger than the evidence that it was a first-degree murder."

There is evidence in the record that defendant was afraid or angry when he killed Morgan. Defendant testified on his own behalf, asserting that he feared for his life and the lives of his family members because Juan and Nate, who along with Morgan had previously assaulted him, were present at the fight that was supposed to be one-on-one. Additionally, the prosecution elicited evidence that defendant was angry. For example, on cross-examination, Serena testified that she told law enforcement that defendant told her he shot Morgan because "'[h]e hated them. He hated them. He hated them, and … he would kill them all if he could[.]'"

However, even assuming substantial evidence supports a heat of passion instruction, the error in failing to give that instruction was harmless. The problem for defendant is that the jury was presented with the evidence that he was afraid or angry, yet they found him guilty of willful, deliberate, and premeditated first degree murder. Given the evidence and this finding, for the reasons described below, the jury necessarily found that defendant did not kill Morgan in the heat of passion.

In *People v. Wharton* (1991) 53 Cal.3d 522 (*Wharton*), our Supreme Court found the trial court erred by refusing the defendant's request to instruct the jury that the provocation for heat of passion voluntary manslaughter could occur over a "'considerable period of time.'" (*Id.* at pp. 569, 570.) The trial court otherwise gave "comprehensive instructions on provocation and heat of passion." (*Id.* at p. 572.) The trial court also instructed the jury "that a killing is first degree murder if it is 'the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not upon sudden heat of passion.'" (*Ibid.*) The court found the instructional error harmless, because, in part, of this instruction: "[b]y finding [the] defendant was guilty of first degree murder, the jury necessarily found [the] defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly

11.

inconsistent with having acted under the heat of passion ….” (*Ibid*; see *People v. Carasi, supra*, 44 Cal.4th at p. 1306 [“First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly [citation], and is evidenced by planning activity, a motive to kill, or an exacting manner of death. [Citation.] Such state of mind ‘is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct.’”].)

In *People v. Peau* (2015) 236 Cal.App.4th 823 (*Peau*), the trial court did not give a heat of passion instruction. (*Id.* at p. 828.) Relying on *Wharton*, the court held that any error was harmless beyond a reasonable doubt because “[t]he jury … was instructed that it could not return a verdict of first degree murder unless it found that [the defendant] ‘carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill,” and “such a finding ‘is manifestly inconsistent with having acted under the heat of passion.’” (*Peau, supra*, at pp. 831–832; see *People v. Franklin* (2018) 21 Cal.App.5th 881, 894 [“the jury’s finding of premeditation and deliberation is ‘manifestly inconsistent with having acted under the heat of passion’ and nullifies any potential for prejudice here”].)[4]

---

**4** We acknowledge that in *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), a case which precedes *Wharton*, our Supreme Court reversed a first degree murder conviction where the court found the trial court prejudicially erred by refusing the defendant’s request to instruct on heat of passion voluntary manslaughter. (*Berry, supra*, at p. 518.)

*Peau* addressed the “tension” between the *Berry* and *Wharton* decisions. (*Peau, supra*, 236 Cal.App.4th at p. 831.) The *Peau* court concluded that *Wharton* is controlling because “the sole issue considered in *Berry* was whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a finding was inconsistent with a finding that the defendant acted in a heat of passion.” (*Peau, supra*, at pp. 831–832.)

And while the court in *People v. Ramirez* (2010) 189 Cal.App.4th 1483 relied on *Berry* to conclude that an erroneous omission of a heat of passion instruction is not rendered harmless by a jury determination that the murder was willful, deliberate, and premeditated, the *Ramirez* court

Here, the jury was instructed that, to convict defendant of first degree murder, the prosecution had to prove that defendant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." (CALCRIM No. 521.) The jury was also instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (*Ibid.*) Given these instructions, the evidence presented in this case, and the jury's finding of premeditation and deliberation, the jury necessarily found that defendant did not kill Morgan in the heat of passion and any error was harmless.

## II. Defendant's Claim of Ineffective Assistance of Counsel Fails

Defendant argues that defense counsel provided ineffective assistance because there was substantial evidence that he was provoked, yet they failed to request CALCRIM No. 522. This instruction states that "'[p]rovocation may reduce a murder from first degree to second degree ....'" (*Ibid.*)

### A. *Applicable Law*

The defendant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, a defendant must show (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, at p. 694.) "Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that

---

did not address *Wharton*. (*Ramirez, supra*, at pp. 1487–1488.) Accordingly, we find *Peau* persuasive and respectfully disagree with *Ramirez*.

is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Id*. at p. 689.)

"It is … particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Reversal is permitted "'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

### B.     Analysis

Prior to the jury instruction conference, defense counsel did request that CALCRIM No. 522 be provided. However, at the jury instruction conference, defense counsel stated that they were not requesting a heat of passion instruction and withdrew their request for CALCRIM No. 522. Defendant fails to carry his burden to show that defense counsel were ineffective because the record does not affirmatively disclose that they had no rational tactical purpose for withdrawing the request for the instruction, they were not asked why they withdrew the request, and there could be a satisfactory explanation.

According to defendant's testimony, he was supposed to fight Morgan one-on-one. However, after he saw Juan and Nate, he feared for his life and the lives of his family members, so he retrieved and fired his gun because he wanted to protect himself and his family. Based on this and other evidence, defense counsel argued that while defendant shot and killed Morgan, because defendant acted in unreasonable self-defense, he was guilty of voluntary manslaughter, not first or second degree murder.

14.

Thus, defense counsel could have withdrawn their request for CALCRIM No. 522 because the instruction did not advance their primary theory of the case: that defendant was guilty only of imperfect self-defense voluntary manslaughter. An instruction on provocation as a basis for second degree murder under CALCRIM No. 522 would have focused the jury's attention on second degree murder, a crime defense counsel specifically argued defendant was not guilty of. It could have been a tactical decision for defense counsel to focus the jury's attention on voluntary manslaughter instead of second degree murder. This is especially so here, because a voluntary manslaughter conviction would have carried a significantly lower sentence than a second degree murder conviction.[5]

As there is a conceivable tactical purpose for defense counsel to have withdrawn their request for CALCRIM No. 522, defendant's claim of ineffective assistance of counsel fails. (*People v. Jasso* (2025) 17 Cal.5th 646, 676 ["'except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal'"].)

## III. The Prosecution Did Not Misstate the Unanimity Requirement For a Finding of First Degree Murder

Defendant argues that the prosecution committed misconduct by misstating the unanimity requirement for a finding of first degree murder. Defendant acknowledges that

---

[5] The term for a second degree murder conviction is 15 years to life. (§ 190, subd. (a).) By contrast, the term for a voluntary manslaughter conviction is three, six, or 11 years. (§ 193, subd. (a).)

Additionally, the section 12022.53, subdivision (d), firearm enhancement that the jury found true, which carries a term of 25 years to life, does not apply to a conviction for voluntary manslaughter. (§ 12022.53, subd. (a); *People v. Fialho* (2014) 229 Cal.App.4th 1389, 1395.) In recognition of this, the prosecution in this case sought a section 12022.5, subdivision (a), enhancement if defendant were convicted of voluntary manslaughter instead of murder. This enhancement carries a term of three, four, or 10 years. (§ 12022.5, subd. (a).)

15.

defense counsel did not object to the prosecution's alleged misstatement, but he argues that an objection would have been futile, and if it was not futile, defense counsel provided ineffective assistance by failing to object.

### A.    *Applicable Law*

""""The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'""" (*People v. Stanley* (2006) 39 Cal.4th 913, 951.)

""""[I]t is improper for the prosecutor to misstate the law.""" (*People v. Aguirre* (2025) 18 Cal.5th 629, 707.)  "To establish such error, bad faith on the prosecutor's part is not required." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)  However, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Id.* at p. 667.)

"'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition .…'" (*People v. Silva* (2001) 25 Cal.4th 345, 373.)  Failure to do so "is excused only when 'an objection would have been futile or an admonition ineffective.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

### B. *Additional Background*

Prior to closing arguments, the jury was instructed with CALCRIM No. 520, which lists the elements of murder. As relevant here, this instruction states, "[t]here are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder." (*Ibid.*) It also states, "[i]f you decide that … defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." (*Ibid.*)

The jury was then instructed with CALCRIM No. 521, which states:

> "[D]efendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [D]efendant acted *willfully* if he intended to kill. [D]efendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [D]efendant acted with *premeditation* if he decided to kill before completing the act that caused death."

At the beginning of their closing argument, the prosecution argued that to prove defendant was guilty of murder, they had to prove that defendant "committed an act that caused the death of another person," that "he had a state of mind called malice aforethought," and that "he killed without lawful justification."

The prosecution then discussed malice aforethought:

> "There are two kinds of malice aforethought: [e]xpress and implied malice. Proof of either is sufficient to establish the state of mind that is required in order to commit murder. The key with malice aforethought, whether it's express or implied, is you 12 do not have to agree on which you think it is. Juror No. 11 could think it's express. Juror No. 10 could think it's implied, and that's okay as long as you-all [*sic*] agree that it is malice."

The prosecution then defined express malice, arguing that defendant had "express malice if he unlawfully intended to kill." The prosecution also defined implied malice

17.

and argued that both express and implied malice were present based on the evidence in this case.

After arguing defendant was guilty of murder, the prosecution stated, "If you decide that … defendant committed murder, which is just what we walked through, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of first degree." They then discussed the elements of first degree of murder:

> "[Defendant] is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [Defendant] acted willfully if he intended to kill when he acted. [He] acted deliberately—or deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [He] acted with premeditation if he decided to kill before completing the act of murder."

The prosecution then argued that defendant acted willfully, deliberately, and with premeditation when he killed Morgan.

### C. Analysis

According to defendant, the prosecution argued that the jury "did not have to reach a unanimous verdict on whether [defendant] harbored express or implied malice" to convict defendant of first degree murder  Defendant argues that this was a misstatement of law because a first degree murder conviction requires a unanimous finding of express malice.

Even assuming that defendant did not forfeit this claim because defense counsel failed to object to the prosecution's arguments, this claim is without merit.

To begin, the prosecution did not misstate the law. The prosecution went through the elements for the crime of murder listed in CALCRIM No. 520. When discussing the element of malice aforethought, the prosecution stated, "The key with malice aforethought, whether it's express or implied, is you 12 do not have to agree on which you think it is. Juror No. 11 could think it's express. Juror No. 10 could think it's

18.

implied, and that's okay as long as you-all [*sic*] agree that it is malice." Defendant does not dispute that, as to second degree murder, this is a correct statement of the law. (See *People v. Brown* (1995) 35 Cal.App.4th 708, 715.)

After discussing the elements listed in CALCRIM No. 520, the prosecution specifically noted that based on what it had just discussed, defendant was only guilty of second degree murder, and that to find defendant guilty of first degree murder, the prosecution had to prove that defendant "acted willfully, deliberately, and with premeditation." The prosecution then stated that to prove defendant acted willfully, they needed to prove that he intended to kill. This is the very definition of express malice. (§ 188, subd. (a)(1); *People v. Saille, supra*, 54 Cal.3d at pp. 1114–1115.)

Accordingly, contrary to defendant's assertion, the prosecution did not argue that the jury could find defendant guilty of first degree murder based on implied malice. Instead, the prosecution made it clear to the jury that, for the jury to convict defendant of first degree murder, the jury had to find that defendant acted with the intent to kill Morgan.

Moreover, even if the prosecution's statement regarding unanimity could be construed as a misstatement of the law because the prosecution did not immediately clarify that they were discussing second degree murder, in light of the record and the instructions, it is not reasonably likely that the jury applied this statement in an improper or erroneous manner. As mentioned above, the prosecution did eventually clarify that the challenged statement related to second degree murder, not first degree murder. The prosecution also told the jury that to convict defendant of first degree murder, they had to find that defendant had an intent to kill. In addition to this, the trial court instructed the jury regarding the elements of first and second degree murder, as well as to follow those instructions if there was a conflict between the instructions and the attorneys' comments. "'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors

19.

treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.""" (*People v. Centeno, supra*, 60 Cal.4th at p. 676.)

Therefore, the prosecution did not misstate the law and, even if they did, it is not reasonably likely that the jury applied their statement in an improper or erroneous manner.

## IV. The Trial Court Did Not Err by Excluding Serena's Testimony That She Was Surprised by the Shooting, and Any Error Was Harmless

Defendant argues that the trial court erred by excluding as irrelevant Serena's testimony that she was surprised by the shooting. According to defendant, this testimony was relevant because it was probative on the issue of premeditation. The prosecution introduced evidence that defendant texted Serena, "'I'll go kill Morgan and them today, and you will have [our daughter],'" and Serena's testimony was evidence that she "had not understood the text as a threat that [defendant] intended to carry out."

### A. Applicable Law and Standard of Review

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

We review a trial court's "rulings regarding relevancy … for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

We review errors in the application of state evidentiary rules under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. McNeal* (2009)

20.

46 Cal.4th 1183, 1203; *People v. Partida* (2005) 37 Cal.4th 428, 439.)  Pursuant to *Watson*, we will reverse only if it is "reasonably probable" that the defendant would have achieved a more favorable result had the error not occurred.  (*Watson, supra*, at p. 836.)[6]

### B.    Additional Background

The prosecution introduced evidence that, on August 8, 2020, defendant texted Serena, "'I'll go kill Morgan and them today, and you will have [our daughter.]'"

On direct examination, defense counsel asked Serena whether she was "surprised by the shooting on August 15, 2020[.]"  The prosecution objected on the basis of relevance, and the objection was sustained.  Subsequently, the trial court heard argument on the issue.  Defense counsel argued that it was relevant because the prosecution had introduced a text message to indicate that defendant was planning on killing Morgan prior to the shooting, and Serena's surprise was evidence that the shooting was not preplanned.  The court once again ruled that "whether or not she was surprised is not relevant."

On redirect examination, defense counsel again asked Serena if she was surprised by the shooting.  The prosecution objected on the basis of relevance, and the objection was sustained.  However, the trial court told defense counsel they could "ask questions

---

**6**    Defendant argues the alleged error triggers review under *Chapman* because the error violated his federal constitutional right to a fair trial.  Under *Chapman*, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict.  (*Chapman, supra*, 386 U.S. at p. 24.)

Defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive.  'As a general matter, the "[a]pplication of the ordinary rules of evidence … does not impermissibly infringe on a defendant's right to present a defense."  [Citations.]  Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.'"  (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.)  Moreover, as discussed below, the error is harmless even if defendant is correct that the more stringent *Chapman* standard applies.

about what she knew at the time." Defense counsel then asked Serena if she knew that on August 15, 2020, defendant was going to shoot Morgan, and she answered, "No."

### C. Analysis

The trial court did not abuse its discretion when it sustained the prosecution's objection based on relevance. Defendant argues that Serena's surprise at the shooting on August 15, 2020, shows that she did not view the text sent by defendant on August 8, 2020, to be a serious threat, and it was thus "probative evidence that rebutted the prosecution's construction of the August 8[, 2020,] text as evidence of premeditation."

There are two problems with this argument. The first is that Serena's surprise at the shooting has, at best, a tenuous connection with her understanding of a text message defendant sent her a week prior. Second, the issue before the jury was whether *defendant* premeditated the murder. Thus, the relevant disputed fact was what defendant meant when he sent the text message stating that he was going to kill Morgan, not what his girlfriend thought he meant. Accordingly, the trial court did not abuse its discretion by excluding Serena's testimony regarding her surprise as irrelevant.

Further, any error was harmless, even under the *Chapman* standard. Defendant argues that "Serena's expectations regarding [defendant's] behavior on August 15[, 2020,] were probative on the issue of premeditation and were relevant rebuttal to the prosecution's evidence of premeditation." Even if this is true, defense counsel was allowed to ask Serena about her expectations regarding defendant's behavior. Defense counsel specifically asked her if she knew defendant was going to shoot Morgan on August 15, 2020, and she said, "No." Additionally, defense counsel asked Taylor, a prosecution witness who had been Serena's friend for approximately 10 years, whether Serena was "shocked" after the shooting, and Taylor said she was. Thus, the evidence defendant sought to introduce regarding Serena's expectations was in fact introduced. Finally, even assuming the trial court should have allowed the testimony, for the reasons described above regarding relevance, its importance was minimal at best. Accordingly,

we conclude beyond a reasonable doubt that excluding Serena's testimony that she was surprised by the shooting did not contribute to the verdict.

## **<u>DISPOSITION</u>**

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

HILL, P. J.

HARRELL, J.